**SEALED**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) SA-14-CR-338(OLG) |
| | ) |
| ROLANDO R. GONZALEZ-TREVINO | ) |
| | ) |
| Defendant. | ) |

## PLEA AGREEMENT PURSUANT TO FRCP 11(c)(1)(C)

The United States of America, by and through its undersigned Assistant United States Attorney, and the Defendant, **ROLANDO R. GONZALEZ-TREVINO** (hereinafter "GONZALEZ", "DEFENDANT" or "RGT"), individually and by and through his attorneys, Doug Daniel and Brandon T. Hudson of the law firm Daniel & Hudson, PLLC, and Alfonso Cabanas, enter into the following plea agreement:

### 1. Defendant's Agreement to Plead Guilty:

The Defendant agrees to plead guilty to Count Two of the indictment, which charges the Defendant with Conspiracy to Transmit Stolen Monies in Interstate and Foreign Commerce, in violation of Title 18, United States Code, Sections 371 and 2314.

In exchange for the Defendant's plea, the Government agrees to dismiss, at the time of sentencing, the remaining counts of the indictment pending against the Defendant in this cause.

### 2. Punishment to be Imposed:

Defendant stipulates that no one has specifically promised what sentence he will receive other than those matters contained in this agreement. Defendant understands that the maximum

punishment to which he could be exposed under Count Two includes the following: (1) not more than five (5) years imprisonment; (a) a maximum fine of $250,000; (3) up to a three (3) year term of supervised release; and (4) a mandatory $100 special assessment.

Defendant acknowledges that he has discussed this range of punishment with his attorney, as well as the advisory Sentencing Guidelines and this agreement, and still wants to plead guilty in this case.

### 3. Factual Basis for Plea:

Defendant agrees and stipulates, as part of this plea agreement, that had this case been presented at trial, the United States would have offered evidence to prove the following facts:

> The United States would offer evidence that in December of 2005, CC1 was a high ranking official in the Mexican State of Coahuila, Mexico. CC1 had previously been an official in Saltillo, Mexico, the capital of the State of Coahuila. CC4, a longtime friend of CC1, became employed by CC1 in the State of Coahuila. CC5 was also employed under CC1 and was also the Director of a Department. CC6 later in 2006, also became a Director in the State of Coahuila for CC1. In July of 2008, CC2 became the Secretary of Finance for the State of Coahuila.
>
> On or about January or February of 2006, CC1 began taking money for his own personal use from the Government of Coahuila. CC1 was using Coahuila State Government Funds and directing those state monies to supporters who were acting in concert with CC1 to steal funds from the State of Coahuila. These persons were principally businessmen who operated within the State of Coahuila, and/or were vendors providing services to the State of Coahuila, and had a relationship with CC1 at the time of his election. Many of these vendors were large scale owners of significant media outlets to include radio, cable, television and outdoor sign companies. Other co-conspirators were vendors of the State that provided services such as road and bridge construction, building construction, provision of services to the populace, and executive aviation services to the State of Coahuila. It is estimated that the funds stolen from the State of Coahuila by CC1 approximates hundreds of millions of dollars.
>
> On or about August 1, 2006, CC1 began to purchase media outlets from various media entities operating within the state of Coahuila. As early as

January or February of 2006, CC1 began to direct the payment of monies from the Coahuila State treasury to CC3, the Defendant's brother and others. CC3 is a wealthy businessman and the owner of many media entities in the State of Coahuila to include radio stations, television channels, cable media outlets and outdoor sign companies. CC3 was instrumental in CC1 winning the governorship of Coahuila.

The United States evidence will show that on or about January 24, 2009, CC2, CC1, CC4, CC5, CC1's wife, and the security detail for CC1 traveled, via private aircraft, from Coahuila, Mexico to San Antonio, Texas. The purpose of the trip was to have a private meeting to discuss political strategy for the Mexican PRI political party and the Governorship of Coahuila, to meet with CC3 and to visit the daughter of CC1, who was living in San Antonio, Texas. Homeland Security investigations (HSI) crossing history data confirmed that CC1 and CC2 entered the United States together on this date, and that the Defendant ROLANDO GONZALEZ-TREVINO was also in the country at this time.

On or about January 25, 2009, CC2, CC1, CC4 and CC5 traveled to the clubhouse at the Sonterra Golf Club, located at Sonterra and Stone Oak Parkway in San Antonio, Texas, and within the Western District of Texas, and met with the Defendant. CC1 and the Defendant met privately at one table while the rest of the party sat at another table. Witness testimony would reflect that CC1 asked CC2 to join CC1 and ROLANDO GONZALEZ-TREVINO at their table. CC1 asked about the current status of the payments to the Defendant and then CC1 informed CC2 that the Defendant would be sending the state of Coahuila invoices to be paid. These were for CC1 to purchase RGT's radio stations and not for legitimate government expense. CC1 stated that the amount to be paid would be 25 million pesos. The purpose of the payment was to secure ownership of a portion of "Nuclear Radio", which consisted of radio stations which were owned and held by the Defendant in Monclova, Sabinas and Muzquiz, in Coahuila, Mexico. The Defendant directed his account information to be provided to CC1, either directly or through CC4, who in turn provided CC2 with a United States bank account number belonging to the Defendant where CC2 was instructed to direct the stolen funds. The purchase of these stations by a Coahuila State government official would be illegal under Mexican law.

On or about March 2009, after the trip to San Antonio, there was at a Cabinet meeting at the Governor's Mansion in Saltillo, Coahuila, Mexico. Present at the meeting included CC1, CC2, CC4, CC6, and all of the 17 Secretaries for the State of Coahuila. At this meeting, CC1 provided the account numbers for accounts the Defendant had in the United States at the First National Bank in Edinburg, Texas.   CC1 insisted that payments be made to the Defendant on

April 7, 2009 and May 4, 2009.

Investigation by HSI and DEA agents revealed that the initial transfer was effected on April 7, 2009 by electronic wire transfer into the Defendant's account in First National Bank of Edinburg, Texas under the account number provided by CC1 (account number ending with 7281). The money was transferred from Mexico through an account held by Administrativos Diam Ante SC through an account from Banco Mercantil Del Norte (BANORTE). The name on the account is Rolando Gonzalez-Trevino, with an address in San Antonio in the same subdivision where the March 2009 meeting transpired. The amount of the electronic wire transfer was $1,100,513.57 USD. This amount, based upon a review of the exchange rate at the time, converts to approximately 15,000,000 Mexican Pesos.

Further investigation also revealed that the second electronic wire transfer was attempted on or about May 7, 2009. Bank records revealed that three (3) electronic wire transfers in the amount of $162,758.65, $294,740.08, and $288,769.94 were attempted on May 7, 2009 from Construcciones Chavana De CV. This account was the same FNB Edinburg account that was used in the April 7, 2009 electronic wire transfer. Chavana is an entity controlled by CC1 and used by him to layer transactions and distributions of stolen funds both within Mexico and internationally into the United States. This wire transfer was not completed. Bank records revealed and bank officials stated that the Defendant's account at FNB Edinburg was closed due to irregularities in the Defendant's prior transactions. Subsequent to the attempted wire transaction, the Defendant had a conversation with CC1 and CC4 and discussed that there were problems with Defendant's account receiving the payments via wire transfer at the bank (FNB-Edinburg) in the US. The Defendant received a subsequent communication by call or text asking for a different account number because the account was closed. The Defendant checked the account, and then called back with another U.S. account number in which to deposit the funds. A witness would testify that the Defendant contacted CC2 by phone and asked CC2 to contact the bank by phone and explain the wire transfers represented legitimate money from the state of Coahuila, Mexico, and were not drug proceeds in order to further the transaction. Bank records reflect the attempted electronic wire transfer of the funds was on or about May 7, 2009.

On or about May 8, 2009, the payment of 10,000,000 Mexican Pesos was made to the Defendant. Bank records revealed that three (3) electronic wire transfers in the amount of $162,758.65, $294,740.08, and $288,769.94 were completed on May 8, 2009 from Construcciones Chavana De CV to the Defendant. The aggregate amount of these transfers is $746,268.67. According to open source information the exchange rate from pesos to USD

on May 7, 2009 was approximately 13.08827. This amount converts to 9,767,365.85 pesos. This transaction was completed by electronic wire transfer from the Bank of New York Mellon to the International Bank of Commerce (IBC)- Laredo. The wire was deposited into an account in the name of Rolando Gonzalez-Trevino with an account number ending in 4676. The values for the transfer were identical to the amounts involved in the attempted transfer on May 7, 2009.

On or about July 2009, at a cabinet meeting in Saltillo, Coahuila, Mexico, CC1 told co-conspirators that the Defendant's radio stations had already been purchased by CC1. CC3 advised that CC1 had plans to purchase additional radio and television stations from CC3, to include a television station in Piedras Negras Coahuila, Mexico.

CC1 utilized his (CC1's) companies to purchase the radio stations from the Defendant, and these companies have nominees and are not in the name of CC1. Witness testimony would show that CC1 held himself out as partners with the Defendant in the radio stations and advised that CC1 would possibly own a share of "Nuclear Radio", the holding company for the Defendant's stations, although not in front of the Defendant.

On or about April 2013, Defendant encountered CC7, a person who also worked with CC1 in Coahuila, while at Las Vegas, Nevada attending a telecommunications trade show. During this encounter, CC7 told Defendant that he (CC7) was ordered by CC1 to pay and wire the money to the Defendant for the purchase of the radio stations, and that the money used to pay for the purchase of Defendant's came from the State of Coahuila funds.

The Defendant ROLANDO GONZALEZ-Trevino now admits that he voluntarily and intentionally participated in a plan to defraud or steal monies from the State of Coahuila with CC1, CC2, CC3, CC4, CC5, CC6 and CC7. ROLANDO GONZALEZ-Trevino admits that he entered into the transactions with the intent to defraud the State of Coahuila. ROLANDO GONZALEZ-Trevino admits that it was reasonably foreseeable to him that interstate and international wire communications would be used to facilitate the scheme, and that interstate and international wire communications were in fact used to commit further the scheme. ROLANDO GONZALEZ-Trevino admits that the money transferred, to wit: $1,846,782.24, which represents approximately 25 million pesos converted to U.S. dollars, was stolen, converted or taken by fraud. ROLANDO GONZALEZ-Trevino admits that

**he knew that these monies were stolen, converted or taken by fraud at the time of the transfer, converted from the state of Coahuila, and transmitted from Mexico into the United States.**

### 4. Defendant's Waiver of Right to Appeal or Challenge Sentence:

Defendant is aware that his sentence may be up to the maximum allowed by statute for his offense(s). He is also aware that the sentence to be imposed is not subject to parole. By entering into this agreement, and as a term of this agreement, Defendant voluntarily and knowingly waives his right to appeal his sentence on any ground, including any appeal right conferred by 18 U.S.C. § 3742. Defendant also voluntarily and knowingly waives his right to contest his sentence in any post-conviction proceeding, including but not limited to, a proceeding pursuant to 28 USC § 2255; provided, however, that consistent with principles of professional responsibility imposed on the Defendant's counsel and counsel for the Government, Defendant does not waive his right to challenge his sentence to the extent that it is the result of a violation of his constitutional rights based on claims of ineffective assistance of counsel or prosecutorial misconduct of constitutional dimension.

Defendant waives his rights to challenge the sentence imposed, knowing that the Court has not yet determined his sentence. Defendant is aware that any estimate of the probable sentencing range that he may receive from his counsel, the Government, or the Probation Office is not a promise, did not induce his guilty plea or this waiver, and does not bind the Government, the Probation Office, or the Court. In other words, Defendant understands that he cannot challenge the sentence imposed by the District Court, even if it differs substantially from any sentencing range estimated by his attorney, the attorney for the Government, or the Probation Officer. Realizing the uncertainty in estimating what sentence he will ultimately receive, Defendant

knowingly and voluntarily waives his rights to appeal the sentence or contest it in any post-conviction proceeding in exchange for the concessions made by the Government in this Agreement.

### 5. Potential Impact of Plea on Immigration Status.

The Defendant further understands that in addition to the punishment described above, if the Defendant is not a citizen of the United States, a plea of guilty can affect immigration status, and may result in deportation and removal from the United States, may prevent the Defendant from ever lawfully reentering or remaining in the United States, and may result in the denial of naturalization.

### 6. Defendant's Waiver of Right to Seek Attorney's Fees:

Defendant hereby stipulates and agrees that by reason of the dismissal of, or the Government's agreement to forebear filing or pursuing, certain criminal charges as a part of this plea agreement, Defendant is not a "prevailing party" for the purpose of seeking attorney's fees under the "Hyde Amendment," Pub. L. No. 105-119, Section 617 (Nov. 26, 1997). Defendant further agrees that as a term of this plea agreement, he hereby waives any and all claims against the United States for attorney's fees under said law.

### 7. Defendant's Acknowledgment of Effective Assistance of Counsel:

Defendant acknowledges that he has reviewed the merits of the charges and all possible defenses that he may have with his attorney. Defendant acknowledges that he has had sufficient time to consult with his attorney on these matters, and he believes he has received effective assistance of counsel. Defendant understands that by pleading guilty, he will be waiving the

following constitutional and statutory rights: the right to have a hearing on any pretrial motion, including, but not limited to, motions to suppress evidence against him; the right to plead not guilty; and the right to be tried by a jury or before a judge. Defendant also understands that, if tried, he would have the right to an attorney and if he could not afford an attorney, the court would appoint one to represent him; he would be presumed innocent and the burden of proof would be on the government to prove him guilty beyond a reasonable doubt; he would have the right to confront and cross-examine witnesses against him; he could testify on his own behalf and present witnesses in his defense; if he did not wish to testify, that fact could not be used against him and a jury would be so instructed; and, if he were found guilty after a trial, he would have the right to appeal that verdict. By pleading guilty, Defendant understands that he is giving up all of these rights, including the right to appeal his conviction and sentence.

## 8. Waiver of Pretrial Motions:

By pleading guilty, Defendant expressly waives all pretrial motions. If any pretrial motions have been filed, this Agreement shall be considered Defendant's express stipulation to request dismissal of all pretrial motions prior to the acceptance of the plea by the District Court. Defendant understands that dismissal of pretrial motions will occur automatically upon pleading guilty. Defendant further understands that in the event this Agreement or his plea is not accepted by the Court, then all pretrial motions dismissed may be reinstated by the Court upon motion by Defendant, and that the United States will not oppose Defendant's motion to reinstate pretrial motions previously filed in this cause in a timely manner. Should Defendant fail to meet his obligations under this Agreement, the United States Attorney for the Western District of Texas would be released from any duty to comply with this Agreement.

**9. Sentencing Agreement:   Agreement under Rule 11(c)(1)(C):**

The parties agree that, pursuant to Fed.R.Crim.P. 11(c)(1)(C), a sentence of five (5) years probation, a $100 special assessment, and a fine and other terms to be set by the Court, would be an appropriate sentence and disposition for this case and hereby request that this Court agree to be bound by the terms of this plea agreement. Should the Court reject the agreement of the parties, the Defendant will be permitted to withdraw his plea of guilty. Should the Defendant decline to withdraw his plea of guilty, the Court may dispose of the case less favorably to the Defendant than contemplated by the plea agreement. If the parties proceed under the terms of this agreement, the parties agree not to seek or advocate any sentence other than the sentence agreed to herein. It is understood by the parties that the final determination to accept a plea pursuant to the Federal Rules of Criminal Procedure 11(c)(1)(C) ultimately remains in the Court's discretion and, if the Court does not accept the parties agreement, then the plea is null and void.

**10.  Waiver of Additional Discovery:**

The Defendant waives the right to any additional discovery, including those rights conferred by Rule 16(a), Federal Rules of Criminal Procedure, and the Court's Standing Discovery Order.

**11.  Forfeiture**

As part of this Plea Agreement, Defendant expressly agrees and stipulates that he will immediately and voluntarily forfeit to the United States of America any and all of his right, title and interest in the following described property, which is set forth in the Notice of United States of America's Demand for Forfeiture, as contained within the Indictment (Doc. 3) returned against him in this cause and within the United States of America's Bill of Particulars for Forfeiture of

Property (Doc. 12), namely:

    funds from bank accounts in the name of NRT Real Estate; NRT Communications Group NRT International Investments; Ramiro Gonzalez Trevino; Rolando Ramiro Gonzalez Trevino; and NRT Enterprises at International Bank of Commerce; and,

    A sum of money equal to the amount of proceeds derived from or traceable to the violations set out in the above-described Counts and for which DEFENDANT ROLANDO R. GONZALEZ-TREVINO is liable,

hereinafter referred to as the "Subject Personal Properties and Subject Money Judgment,"

Defendant further agrees and stipulates that he has no objection to, and does not contest the administrative, criminal and/or civil forfeiture of all his right, title and interest in the Subject Personal Properties and Subject Money Judgment to the United States of America.

Defendant agrees that the Factual Basis of this Plea Agreement establishes that the Subject Personal Properties and Money Judgment are forfeitable to the United States of America pursuant to Title 18 U.S.C. § 981 (a)(1)(C) made applicable to criminal forfeiture by Title 28 U.S.C. § 2461, for violations of Title 18 U.S.C. §§ 371 and 2314.

Defendant further agrees and stipulates that the Subject Personal Properties and Subject Money Judgment represent the proceeds derived from or traceable to violations of Title 18 U.S.C. §§ 371 and 2314.

Defendant hereby waives the requirements of Fed. R. Crim. P. 32.2 with respect to the imposition of any forfeiture action carried out in accordance with this Plea Agreement, and further agrees not to contest or challenge such forfeiture in any manner, including direct appeal, habeas corpus or that the forfeiture constitutes an excessive fine or punishment.

Defendant further agrees and stipulates as part of this Plea Agreement that the United States is not limited to the forfeiture of the Subject Money Judgment. If the United States

determines, at any time, that any of the conditions set forth in Title 21 U.S.C. § 853(p) exist, then the United States shall, at its option, be entitled to forfeiture of any other property (substitute assets) equivalent to the value of the Subject Money Judgment.

Defendant further agrees, stipulates and waives any and all right to a jury trial on forfeiture issues regarding the Subject Personal Properties.

## 12. Reservation of Rights:

The parties reserve their rights (a) to bring their version of the facts of this case to the attention of the United States Probation Office in connection with that office's preparation of a presentence report; (b) to dispute sentencing factors or facts material to sentencing in the presentence report; and (c) to seek resolution of such factors or facts in conference with opposing counsel and the United States Probation Office.

This constitutes the entire agreement between the parties.

DATE: __April 3__, 2015

_____
Russell D. Leachman
Assistant U.S. Attorney
Texas State Bar No. 112069710
601 NW Loop 410, Suite 600
San Antonio, Texas 78216-5512
(210) 384-7022
(210) 384-7028 FAX

I have consulted with my attorney and fully understand all of my rights with respect to the Superseding Information. We have also discussed, and I fully understand, the fact that the Sentencing Guidelines and Policy Statements are advisory rather than mandatory. I have read this Agreement and carefully reviewed every part of it with my attorney. I understand this Agreement and I freely and voluntarily agree to it.

DATE: __4/3__, 2015

_____
ROLANDO GONZALEZ-TREVINO
Defendant

      We are the Defendant's attorneys. We have fully explained to Defendant his rights with respect to the Superseding Information and the provisions of the Sentencing Guidelines and Policy Statements to the extent that they apply in this case. We have carefully reviewed every part of this Agreement with Defendant. In each of our individual opinion, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

DATE: __4/3__, 2015

_____
DOUG DANIELS, Attorney

_____
BRANDON T. HUDSON, Attorney

_____
ALFONSO CABANAS, Attorney